# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3249

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Robert Lee McClellon, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 12, 2009
Filed: August 27, 2009

_____

Before MURPHY, SMITH, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Robert McClellon was convicted of possession with intent to distribute at least five grams of cocaine base, also known as "crack cocaine," in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and sentenced to the statutory mandatory minimum of 120 months' imprisonment. On appeal, McClellon argues that (1) insufficient evidence exists to support the jury's finding that he possessed with intent to distribute at least five grams of crack cocaine; (2) the district court[1] abused its discretion in denying his

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

motion for a new trial; and (3) the statutory mandatory minimum sentence for crack cocaine is unconstitutional. We affirm.

## I. *Background*

During the morning hours of September 10, 2007, Southeast Iowa Narcotics Task Force (SEINT) Investigator Eldon Melssen was conducting surveillance at McClellon's residence. Investigator Melssen observed a vehicle parked near McClellon's residence. Two of the five occupants of the vehicle—a male and a female—exited the vehicle, walked to the residence, and entered the residence. After staying in the residence for approximately ten minutes, the two individuals left the residence and rejoined the three other persons in the vehicle.

Investigator Melssen called the station to have the license plate number matched to the registered owner. Unsuccessful, he then requested the assistance of Task Force Investigator Chris Chiprez. Investigator Chiprez stopped the vehicle after it left McClellon's residence. Investigator Melssen went to the location of the stopped vehicle and observed the two individuals who had previously entered McClellon's residence sitting in the backseat. These individuals were identified as Karen Leeson and David Jeffrey. Investigator Chiprez found a tobacco pouch containing a green leafy substance in the vehicle that he believed to be marijuana. Leeson and Jeffrey agreed to cooperate with the investigators and were later released from the scene without being charged.

Using information gathered from their investigation, SEINT officers applied for, and were granted, a state warrant to search McClellon's residence. During the afternoon of September 10, 2007, officers executed the search warrant. As the officers approached the residence, they observed several individuals present inside and outside of the residence. Those present included Jerry Clark, Jamall Gant, Timothy Fleming, Diana Cooper, Sonya Andries, and McClellon. Investigator Melssen testified that two

females were present at the time of the search warrant but that he was unaware that either of them lived at the residence.

During the search, officers seized the following items: (1) a large assortment of pill bottles and accompanying prescription pills located throughout the bedroom and in containers on a series of bedroom shelves; (2) a Winchester Model 1200 shotgun found under the bed in the bedroom; (3) six assorted scales found in the bedroom; (4) a pair of pants found on the floor of the bedroom containing an Iowa identification card for "Robert Lee McClellon," a pill bottle containing 6.45 grams of crack cocaine, a baggie of pink pills, later identified as alprazolam, and a baggie containing 3.80 grams of marijuana; (5) a jacket found in the bedroom containing a baggie of 91.21 grams of marijuana; (6) a purse found in the bedroom containing some pills; (7) one hitter marijuana pipe found under the bed in the bedroom; (8) one marijuana bong found on a shelf in the bedroom; (9) one cigarette pack containing a pipe consistent with the type used to ingest crack cocaine found in a duffel bag in the living room; (10) one pipe consistent with the type used to smoke crack cocaine found on the floor in the living room; (11) six food stamp cards found at various locations in the bedroom; (12) one Marlin 12-gauge bolt action rifle found in the corner of the bedroom; (13) two crack pipes found in the basement; and (14) assorted firearm ammunition found in the bedroom.

McClellon was indicted for possession with intent to distribute at least five grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). The government notified McClellon of a possible sentence enhancement based on a prior conviction for a felony drug offense.

At trial, Leeson testified that in September 2007 she was getting marijuana from McClellon. Beginning in approximately April 2007, Leeson went to McClellon's residence and received marijuana two to five times a week. Normally, Leeson would go into the bedroom with McClellon and tell him how much marijuana she wanted.

-3-

McClellon would then weigh out the marijuana on an electronic scale. McClellon would not have the marijuana individually bagged ahead of time. Leeson confirmed that McClellon was the individual who always distributed the marijuana to her and stated that McClellon "always took care of his own business." According to Leeson, on one occasion she smoked marijuana with McClellon at the house but never saw him use crack cocaine. She recalled seeing others go into the bedroom to meet with McClellon. She also testified to purchasing Xanax and Valium from McClellon for one dollar per pill.

Keri Christofferson, who had previously lived with McClellon at two locations, including for about one year at his current residence, testified pursuant to a cooperation plea agreement with the government. She described for the jury the current status of her mental health, her medications, and her past drug use. According to Christofferson, after moving out of McClellon's residence in March or April 2007, she continued visiting the residence three to four times per week. While at the residence, Christofferson saw McClellon use marijuana and pills but never saw him use crack cocaine. She testified that she would use crack cocaine almost every time that she visited McClellon's residence and that she recalled getting crack cocaine from McClellon.

While living with McClellon, Christofferson observed McClellon distribute crack cocaine "every day." She recalled that McClellon would get crack cocaine in increments of seven to 14 grams but that at no time did she ever see McClellon use any of this crack cocaine. Often, Christofferson would act as the middle person between McClellon and crack customers. She stated that sometimes other people living in the house had her go into McClellon's bedroom and purchase crack for them.

According to Christofferson, in exchange for the crack that he distributed, McClellon accepted payment in the form of cash, jewelry, tools, clothing, and guns. Specifically, in July or August 2007, Christofferson recalled exchanging two guns for

$50 worth of crack and $20 in cash. SEINT officers seized those guns during the search on September 10. She also testified that McClellon kept his crack cocaine in a little pill bottle in his bedroom and also kept both pills and marijuana in his room. She identified some pink pills seized out of a pair of pants as the pills that she had previously sold to McClellon. She testified that she personally sold food stamp cards to McClellon and also observed other people trade these same type of cards to McClellon in exchange for crack, marijuana, or cash. According to Christofferson, she also observed other individuals trading pills for crack, marijuana, or cash.

Christofferson identified from a photograph a scale and a knife that McClellon used to cut and weigh crack and marijuana for redistribution. She recalled seeing McClellon with several different scales. She provided a detailed account and recognition of various items seized out of McClellon's room and the various containers and locations in which McClellon hid his crack, marijuana, and pills. She testified that she was personally aware of two individuals that lived in McClellon's basement, both of whom used crack pipes made out of metal fittings.

Iowa Division of Narcotics Enforcement Special Agent Tani Tanio explained that, based on her education, training, and experience, cocaine base was normally used and purchased by users in quantities ranging from 1/4 gram to .8 grams. She testified that amounts in 1/8 ounce and above were normally consistent with quantities for distribution rather than personal usage. According to Agent Tanio, the 5.45 grams of cocaine base seized from McClellon's bedroom were consistent with a quantity normally associated with distribution.

Jackie McClellon, McClellon's estranged wife, testified on McClellon's behalf. According to Jackie, she had been married to McClellon for 20 years but lived separate from McClellon for the last ten years. She testified that McClellon had lived at his current residence for 25 years. She stated that she visited the residence one to three times a week and never saw any marijuana, cocaine, or pills around the house.

She testified that McClellon took medications for his diabetes, congestive heart failure, and hypertension. And, although Jackie admitted to seeing McClellon smoke marijuana at the residence, she denied ever seeing anything that looked like crack cocaine in the residence.

The jury found McClellon guilty of possession with intent to distribute crack cocaine and additionally found beyond a reasonable doubt that McClellon was responsible for five grams or more of crack cocaine. McClellon filed a motion for a new trial and a motion for judgment of acquittal. He argued that the district court should grant his motion for judgment of acquittal because insufficient evidence supported the verdict that he possessed with intent to distribute at least five grams of crack cocaine. He asserted that the district court should grant his motion for a new trial based on several grounds, including: (1) the jury was unable to fairly evaluate the quantity issue after finding McClellon guilty of the underlying possession-with-intent-to-distribute offense; (2) the government's argument that no one testified that McClellon was a crack user improperly allocated the burden of proof to McClellon, in violation of the Fifth and Sixth Amendments; (3) the argument that McClellon did not use crack cocaine was contrary to the evidence; (4) the Eighth Circuit has recognized that persons who distribute controlled substances are typically users; (5) Christofferson's testimony was speculative on the quantity element; and (6) introduction of Christofferson's written plea agreement into evidence had the improper effect of vouching for her credibility.

The district court denied both of McClellon's motions. With regard to the motion for judgment of acquittal, the court concluded that "a reasonable fact finder could have found Defendant guilty beyond a reasonable doubt of possession with intent to distribute five or more grams of crack cocaine." In support of this conclusion, the district court cited Investigator Melssen's testimony that he recovered crack cocaine from the pocket of a pair of McClellon's pants located in McClellon's bedroom. The district court noted that these pants also contained an Iowa

identification card for McClellon, marijuana, and a plastic baggie of pink pills. According to the court, "[t]he presence of the crack cocaine in defendant's pants, which were located in defendant's bedroom of the house that he owned, meets the requirements for constructive possession." As a result, the court concluded that the government's evidence that McClellon constructively possessed crack cocaine was sufficient to prove the first element of possession with intent to distribute crack cocaine.

The district court then discussed the 6.45 grams of crack cocaine recovered from McClellon's pants pocket. The court noted Agent Tanio's testimony that "amounts of crack cocaine in excess of 1/8 of an ounce are consistent with distribution quantities as opposed to personal use quantities." The court found that "[t]he evidence presented at trial affirmatively demonstrated that defendant was not a crack cocaine user" and pointed out that drug paraphernalia for distributing crack cocaine was found in McClellon's residence, including a knife for cutting crack cocaine and scales for weighing it. The court also noted that, pursuant to Federal Rule of Evidence 404(b), the government had submitted evidence that McClellon previously possessed and distributed marijuana and prescription pills for the purpose of showing McClellon's knowledge and intent. Therefore, the court held that such "evidence is sufficient for a reasonable fact finder to determine that the government proved the element of intent to distribute under 21 U.S.C. § 841(a)(1)."

As to McClellon's motion for a new trial, the district court rejected McClellon's arguments that it should grant him a new trial because "(1) the 'interests of justice' require such [because of the speculative nature of the government's evidence on the quantity element, and the significance of the quantity issue in this case with regard to punishment], and (2) the government improperly vouched for the credibility of witness Christofferson by introducing into evidence her written plea agreement." The district court concluded that "no miscarriage of justice" occurred"[a]fter weighing the evidence presented at trial, including the approximate 6.[4]5 grams of crack cocaine,

multiple scales, firearms, and other drug paraphernalia found in defendant's home, as well as the credibility of the witnesses, including Christofferson." And, the court found that, under Eighth Circuit precedent, "the government's introduction and use at trial of Christofferson's plea agreement is clearly permissible." Thus, the court denied McClellon's motion for a new trial.

## II. *Discussion*

McClellon raises three arguments on appeal. First, he asserts that insufficient evidence exists to support the jury's finding that he possessed with intent to distribute at least five grams of crack cocaine. Second, he contends that the district court abused its discretion in denying his motion for a new trial. Finally, he argues that the statutory mandatory minimum sentence for crack cocaine is unconstitutional.

## A. *Sufficiency of the Evidence*

McClellon maintains that insufficient evidence exists to support the jury's finding that he possessed with intent to distribute at least five grams of crack cocaine because (1) there was testimony that McClellon shared his bedroom, where the crack cocaine was found in a pair of pants, with Sonja Andries; (2) no attempt was made to obtain fingerprints from the pill bottle found in the pair of pants; (3) the pants were not seized by the police and there was no evidence that the pants fit McClellon; (4) no witness testified about how the crack cocaine got to the residence, who brought it there, how long it was there, or why it was there; and (5) no one testified that they had made arrangements to purchase crack cocaine from McClellon on or about September 10, 2007.

We review de novo a district court's denial of a motion for judgment of acquittal. *United States v. Thomas*, 565 F.3d 438, 441 (8th Cir. 2009). "This court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict. " *Id*. We will only

reverse a jury's verdict "where 'no reasonable jury could have found the [accused] guilty beyond a reasonable doubt.'" *Id*. (quoting *United States v. Harmon*, 194 F.3d 890, 892 (8th Cir. 1999) (alteration in *Thomas*).

"The offense of possession with intent to distribute consists of two elements: knowing possession of crack cocaine and the intent to distribute it." *United States v. Barrow*, 287 F.3d 733, 736 (8th Cir. 2002). As to the first element, "[p]ossession of contraband can be either actual or constructive." *United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002). "[A]n individual has constructive possession of contraband if he has ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed." *Id*. (internal quotations and citation omitted). "'*[K]nowledge* of presence,' combined with '*control* over the thing is constructive possession.'" *Id*. (quoting *United States v. Lemon*, 239 F.3d 968, 971 (8th Cir. 2001) (emphasis added in *Cruz*). If knowledge of presence exists, then "control is established by proof the person has dominion over the premises in which the contraband is concealed." *Id*. (internal quotations and citation omitted).

As to the second element, "[c]ircumstantial evidence such as drug quantity, packaging material, and the presence of cash may be used to establish intent to distribute, but possession of only a small quantity of illegal drugs does not justify an inference of such intent [to distribute]." *Barrow*, 287 F.3d at 736–37 (noting that "[a] narcotics officer testified that the average dose of crack cocaine is approximately one-fourth of a gram"). Thus, "[p]ossession of such a small amount of drugs, standing alone, is an insufficient basis from which to infer intent to distribute." *United States v. Delpit*, 94 F.3d 1134, 1153 (8th Cir. 1996) (citing *United States v. Buchanan*, 985 F.2d 1372, 1377 (8th Cir. 1993); *United States v. Gordon*, 923 F.2d 123, 125–26 (8th Cir. 1991) (one ounce of cocaine, standing alone, would not have been enough to support inference of intent to distribute); *United States v. White*, 969 F.2d 681, 684 (8th Cir. 1992) (7.5 grams of cocaine was insufficient, standing alone, to support inference of intent to distribute, but as little as 5 grams could be sufficient, if

accompanied by circumstantial evidence); *United States v. Stephens*, 23 F.3d 553, 557 (D.C. Cir. 1994) (5.9 grams of crack was not enough to support inference of intent to distribute)). "Of course, we don't look at the amount of drugs alone; even a small amount, if bolstered by other evidence, can show intent to distribute." *Id*. "For example, we have held that the drugs' purity level, or the presence of cash, drug paraphernalia, firearms, and other evidence of drug-dealing, are all factors that can support an inference of intent to distribute." *Id*.; *see also United States v. Dawson*, 128 F.3d 675, 677 (8th Cir. 1997) ("This Court has set forth factors from which an intent to distribute a controlled substance may be inferred. Most significant is the presence of a firearm."). "Other evidence" also includes, for example, "a scale" and "witness testimony." *United States v. Navarrete-Navarrete*, 287 Fed. Appx. 549, 551 (8th Cir. 2008) (unpublished per curiam). Furthermore, "[t]he jury could infer intent from [the defendant's] past conduct." *United States v. Turpin*, 920 F.2d 1377, 1383 (8th Cir. 1990) (where defendant was charged with possession of cocaine with intent to distribute, jury could infer intent to distribute from testimony indicating that the defendant had sold cocaine on previous occasions).

In the present case, the government presented sufficient evidence of McClellon's "constructive possession" of the crack cocaine. The bedroom that was searched belonged to McClellon, as McClellon's wife testified that McClellon owned the house and had lived there for 25 years; thus, McClellon had "dominion and control" over it. That bedroom contained numerous items, including prescription pills, marijuana, and crack cocaine. On the floor of McClellon's bedroom, Investigator Melssen found a pair of jeans that contained marijuana, a plastic baggie of pink pills, and a pill bottle with approximately 6.45 grams of cocaine base. This pair of jeans also contained an Iowa identification card for "Robert Lee McClellon." Christofferson testified that McClellon kept crack cocaine either in his bedroom or in his pockets. Both Leeson and Christofferson described witnessing and participating in the purchase and receipt of controlled substances from McClellon out of that bedroom. Specifically,

-10-

Christofferson identified the pills found in the pants as pills that she had recently sold to McClellon.

Additionally, the government supported McClellon's "possession" of 6.45 grams of crack cocaine with other evidence to show his "intent to distribute." First, Agent Tanio described that, based on her education, training, and experience, cocaine base was normally used and purchased by users in quantities ranging from 1/4 to .8 grams. According to Agent Tanio, amounts in 1/8 ounce and above were normally consistent with quantities for distribution rather than personal use. Thus, the 6.45 grams of cocaine base seized from McClellon's bedroom were consistent with a quantity normally associated with distribution.

Second, out of the bedroom where the cocaine base was seized, the police also found a Winchester Model 1200 shotgun and a Marlin 12-gauge bolt action rifle. Christofferson identified these two firearms as the ones that she sold to McClellon in exchange for $50 worth of crack and $20 cash.

Third, the police seized "drug paraphernalia," including several scales consistent with the type used to weigh out drugs for distribution and a knife for cutting drugs. Leeson and Christofferson testified to observing McClellon possess and use several different scales during drug transactions, and Christofferson testified to seeing McClellon use the knife and one of the scales to cut pieces of crack cocaine, weigh them, and sell the pieces of crack to customers.

Fourth, Christofferson testified that, in exchange for crack, McClellon would accept payment in the form of cash, jewelry, tools, clothing, and guns. She also observed individuals trade food stamps and pills in exchange for crack cocaine; both of these items were found in McClellon's bedroom during the search.

Finally, the government introduced evidence of McClellon's past conduct in selling drugs. Leeson admitted that the marijuana seized from her during the traffic stop was purchased from McClellon. Leeson additionally described that, beginning in April 2007, she was purchasing marijuana from McClellon two to five times a week. She said that she would meet with him in his bedroom and purchase marijuana from him. While in the bedroom, McClellon would remove the marijuana, weigh it on a scale, and give it to her. While at the residence, Leeson saw other individuals go in and out of the bedroom to meet with McClellon. She also testified to purchasing prescription pills for a dollar a piece from McClellon. Christofferson testified that, when she lived with McClellon, she saw him use marijuana and pills but never saw him use crack cocaine, even though she was using crack cocaine on a regular basis at the residence. She stated that during the time that she lived with him, McClellon distributed crack cocaine "every day." She described how McClellon would normally get crack cocaine on a regular basis in seven or 14 gram amounts and that she received crack cocaine from McClellon, acted as a middleman in arranging the distribution of crack cocaine from McClellon, and got crack cocaine from McClellon to distribute and deliver to others. She observed on a weekly basis other individuals trading pills to McClellon in exchange for crack, marijuana, and cash. She also observed the various items that the drug customers would trade to McClellon, including cash, food stamps, jewelry, tools, and guns.

Accordingly, we hold that the district court committed no error in denying McClellon's motion for judgment of acquittal, as sufficient evidence exists to support the jury's verdict.

B. *Motion for a New Trial*

McClellon contends that the district court should have granted him a new trial because (1) the "interests of justice" require a new trial due to the speculative nature of the government's evidence, especially as to the quantity element and (2) the government improperly vouched for Christofferson's credibility by introducing into

evidence her written plea agreement and by making a statement during closing argument that "she doesn't get to testify falsely and accuse someone and get the benefit of the plea agreement."

"'Upon the defendant's motion, the [district] court may vacate any judgment and grant a new trial if the interest of justice so requires.'" *United States v. Starr*, 533 F.3d 985, 999 (8th Cir. 2008) (quoting Fed. R. Crim. P. 33) (alteration in *Starr*). Under Rule 33, the district court is permitted to "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Id*. (internal quotations and citation omitted). "A district court may grant a new trial under Rule 33 only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." *Id*. (internal quotations omitted). Although the district court possesses "broa[d] discretion to grant a new trial under Rule 33," it "must exercise the Rule 33 authority sparingly and with caution." *Id*. (internal quotations and citations omitted). We review a district court's denial of a motion for a new trial for an abuse of discretion. *Id*.

### 1. *"Speculative" Nature of Government's Evidence*

McClellon argues that because of the speculative nature of the government's evidence, especially with regard to drug quantity, the district court abused its discretion by denying his motion for a new trial. Specifically, McClellon argues that (1) the district court abused its discretion by relying on the government's "speculative" evidence that he was a crack distributor and not a crack user; (2) the district court failed to give sufficient weight to the fact that the pants containing the crack cocaine were not seized by the police and checked to see if they fit McClellon and that the pants were found on the floor next to a purse, which was most likely Sonja Andries, as she stayed in McClellon's room from time to time; and (3) the district court abused its discretion in failing to give sufficient weight to the alleged conflicts in testimony of Leeson, Christofferson, and Jackie McClellon.

We reject McClellon's arguments that the government's evidence was "speculative." First, with regard to the evidence that McClellon was a crack distributor as opposed to a crack user, the crack pipes that were found in the home were not found in McClellon's bedroom, where the crack cocaine was found. Instead, two of the crack pipes were found in the living room and two were found in the basement. There were several other individuals present at the residence on September 10. One of the pipes was found in a duffle bag in the living room and one was found on the floor, neither of which were identified as belonging to McClellon. A photograph of one of these pipes was shown to Christofferson, who stated that the pipe appeared to be of the type used by "Sonja or Crystal," not McClellon. As to the two crack pipes found in the basement, Christofferson testified that these pipes were similar to the ones used by two people that moved into the basement after she moved out. Christofferson also testified that McClellon was not a crack user. Thus, there was no direct evidence that McClellon ever "used" crack cocaine.

As to the pants found in McClellon's bedroom, Investigator Melssen testified that he checked the purse found near the pants and did not find any identification inside indicating that it belonged to Andries. But Investigator Melssen did find McClellon's identification in the pants containing the crack cocaine. Photographs were presented to the jury showing how the pants were found in the bedroom. Also, Leeson testified that Andries stayed in McClellon's room only "from time to time" and was not involved in the drug transactions.

Finally, with regard to the alleged conflicts in the testimony of Leeson, Christofferson, and Jackie McClellon, McClellon alleges that Christofferson's description of frequently being at his residence was not credible because Leeson and Jackie McClellon did not recall seeing Christofferson there. Christofferson also testified that she did not know Leeson. But Leeson, a marijuana customer, testified that she only knew a couple of people, and only by their first names, and that she began to purchase marijuana from McClellon in April 2007—the time period in which

Christofferson was moving out of the residence. After she moved out, Christofferson was still going to McClellon's residence three to four times a week but was there to use and distribute crack cocaine, not marijuana. Leeson described generally showing up, waiting her turn to meet McClellon, and then leaving, remaining on a few occasions to smoke marijuana with McClellon. And, Jackie McClellon testified that she did not go in McClellon's bedroom much and never saw anything related to crack cocaine at the residence. Jackie McClellon's infrequent presence in McClellon's bedroom would explain why she did not see anything related to crack cocaine, as Christofferson explained that the bedroom was where McClellon kept it.

Christofferson gave a detailed description of McClellon's crack cocaine, marijuana, and prescription pill distribution that was corroborated by the evidence seized. For example, she recalled that McClellon received crack cocaine in seven or 14 gram amounts and kept the crack in various containers, including a pill bottle. The day of the search, the quantity of crack cocaine seized out of a pill bottle in a pair of pants in McClellon's bedroom was 6.45 grams. Christofferson described McClellon's involvement in the receipt and sale of prescription medications, which was corroborated by the numerous prescription pills seized from his bedroom. She specifically identified pink pills found in the same pants containing the crack cocaine as pills that she had traded McClellon. Her description of items traded for drugs was corroborated by the jewelry seized, numerous food stamp cards, firearms, and cash seized. She stated that McClellon would usually not package the crack cocaine but used a knife to cut off a piece, weigh it on a scale, and then give it to the customer; this testimony was corroborated by her identification of a photograph taken in McClellon's bedroom of a knife and scale on September 10, 2007, as the same knife and scale that she observed McClellon use in the past to distribute crack cocaine. This record reflects ample credible evidence to support the jury's guilty verdict.

## 2. *Vouching for Witness's Credibility*

McClellon also argues that the government improperly vouched for Christofferson's credibility through the use of a written plea agreement and statements made during closing argument.

"Improper vouching may occur when the government: (1) refers to facts outside the record or implies that the veracity of a witness is supported by outside facts that are unavailable to the jury; (2) implies a guarantee of truthfulness; or (3) expresses a personal opinion about the credibility of a witness." *United States v. Benitez-Meraz*, 161 F.3d 1163, 1167 (8th Cir. 1998).

### a. *Introduction of Written Plea Agreement*

"In this circuit, a confederate's guilty plea or plea agreement is admissible on the government's direct examination of the witness as evidence of the witness' credibility or of his acknowledgement of participation in the offense." *United States v. Drews*, 877 F.2d 10, 12 (8th Cir. 1989). Whether to admit a written plea agreement into evidence is "committed to the district court's discretion." *United States v. Morris*, 327 F.3d 760, 762 (8th Cir. 2003).

In response to a defendant's argument that admission of a plea agreement of a witness "unfairly bolstered the witness['s] credibility because [its] terms required [the witness] to testify truthfully," this court has stated:

> [W]hile the existence of a plea agreement may support the witness' credibility by showing his or her interest in testifying truthfully, the plea agreement may also impeach the witness' credibility by showing his or her interest in testifying as the government wishes regardless of the truth. Introduction of the entire plea agreement permits the jury to consider fully the possible conflicting motivations underlying the witness' testimony and, thus, enables the jury to more accurately assess the witness' credibility.

*Drews*, 877 F.2d at 12 (internal quotations and citations omitted). Thus, "evidence of the existence, the terms, and the witness's understanding of a plea or witness immunity agreement is not vouching." *United States v. Santana*, 150 F.3d 860, 863 (8th Cir. 1998) (internal quotations, citation, and alteration omitted) (holding that there was no impermissible vouching when witness, when asked to explain terms of his plea agreement, replied "Just to tell the truth."); *see also United States v. Tulk*, 171 F.3d 596, 600 (8th Cir. 1999) (holding that, where government admitted into evidence unredacted plea agreement in which witness had stipulated to involvement with the defendants in possessing and distributing methamphetamine, such evidence did not bolster the credibility of the government witnesses because "[e]vidence showing the existence of a plea agreement, its terms, and a witness' understanding of the agreement is not improper"); *United States v. Kamerud*, 326 F.3d 1008, 1017 (8th Cir. 2003) ("The prosecutor did not improperly vouch for the government's cooperating witnesses merely by asking them about the plea agreements they had reached with the government, part of which included the government's agreement to move for downward departures on their sentences in exchange for truthful testimony.").

Here, Christofferson's plea agreement contained provisions requiring Christofferson's cooperation with the government and requiring her testimony to be truthful. Our circuit's precedent permits admission of such plea agreements as evidence of the witness's credibility and leaves the matter to the sound discretion of the district court.

### b. *Prosecutor's Statements During Closing Argument*

McClellon argues that the prosecutor "improperly vouched" for Christofferson's credibility during closing argument. But McClellon failed to object to the prosecutor's statement at trial. Therefore, we review for plain error. *Tulk*, 171 F.3d at 599. "[McClellon] must therefore show that the error was plain, meaning clear or obvious; and that the error affected his substantial rights, which requires a showing that the error was prejudicial and affected the trial's outcome." *Id.* (internal quotations,

alterations, and citation omitted). "Even clear errors will only matter if a miscarriage of justice would otherwise result that might seriously affect the fairness, integrity or public reputation of the judicial proceedings." *Id.* "Reversal for prosecutorial misconduct is not required unless it prejudicially affected an individual's substantial rights and deprived him of a fair trial." *Id.* "Factors to consider in assessing prejudice include the cumulative effect of any misconduct, the strength of the properly admitted evidence, and any curative actions taken by the trial court." *Id.*

"Attempts to bolster a witness by vouching for his credibility are normally improper." *United States v. Jackson*, 915 F.2d 359, 361 (8th Cir. 1990) (internal quotations and citation omitted). But "[w]here the prosecutor, his witnesses, or the work of the government agents is attacked by defense counsel, the District Attorney is entitled to make a fair response and rebuttal." *United States v. Williams*, 97 F.3d 240, 246 (8th Cir. 1996) (internal quotations, alteration in *Williams*, and citation omitted) (rejecting defendant's argument that "the prosecution improperly vouched for its witnesses" where the prosecutor, during closing argument, "rebutted defense allegations of witness perjury by noting that the witnesses had not yet been sentenced for their roles in the conspiracy"); *see also United States v. Beaman,* 361 F.3d 1061, 1066 (8th Cir. 2004) (holding that prosecutor did not improperly vouch for a witness's credibility when he argued that he would not risk his career to threaten a witness to get her to change her story; argument was made in rebuttal to defense argument that witness only changed her story when threatened with prosecution and granted immunity); *United States v. Lee*, 743 F.2d 1240, 1253 (8th Cir. 1984) ("Where the District Attorney's remarks are prompted by statements of defense counsel, it has been held that there is no reversible error.").

In the present case, McClellon's defense counsel made the following statement during closing argument:

Well, when was it that Ms. Christofferson had her meeting with the government? They went over these photographs, it was just last Saturday, so she is pretty aware of what the evidence is and what the issues are in this case and I am not accusing the government of coaching her or saying anything—telling her what to say, but I think that you could reasonably assume that if she wants to get out of jail, she better say whatever is necessary in order to try to make sure that Mr. McClellon is convicted so that she can get her reduced sentence.

In response, the government argued in rebuttal:

So you can take into account her Plea Agreement and I ask you to look at those Plea Agreements and there's two sections in that Plea Agreement, Government's Exhibit 127, you can look at that when you go back, her written Plea Agreement. The defendant wants you to believe only if she testifies favorably does she qualify for a sentence reduction. You will notice a couple paragraphs in this Plea Agreement, there's one on page five which talks about her cooperation. Part of that paragraph notes that she agrees to answer all questions and will not withhold any information. She will neither attempt to protect any person or entity through false information or omission or falsely implicate any person, but she doesn't get to testify falsely to accuse someone and get the benefit of this Plea Agreement.

On page six, Paragraph 15, a paragraph called Truthful Testimony. Part of that notes that the defendant agrees to tell the truth at all times whether it be during this investigation or as a witness at trial regardless who asks the questions, the prosecutor, the law enforcement agent, the judge, or the defense attorney. So while the government is not asking you not consider that Plea Agreement, it is part of it and there's no big surprise that people in jail would really like to get out early.

Here, as in *Williams*, *Beaman*, and *Lee*, the government's rebuttal statement was made in response to defense counsel's argument that Christofferson would provide false testimony for the government in order to get a reduced sentence in her plea deal.

Thus, the government could respond by asking the jury to consider the terms of the written plea agreement in assessing the truthfulness of Christofferson's testimony. The prosecutor did not express a personal opinion but instead asked the jury to consider the actual terms of the plea agreement, which was admitted into evidence.

Accordingly, we hold that the district court did not abuse its discretion in denying McClellon's motion for a new trial.

## C. *Statutory Mandatory Minimum*

McClellon's final argument is that the imposition of the mandatory minimum sentence required by 21 U.S.C. §§ 841(b)(1)(B) and 851 violates his right to due process and equal protection of the law. Specifically, McClellon asserts that "[t]he current severity of crack cocaine penalties mostly impacts minorities, the assumptions underlying the disparity are unfounded, and by way of remedy, this court should declare that the statutory mandatory minimum sentence called for in this case violates the equal protection provisions of the due process guaranty of the federal constitution."

We have previously rejected McClellon's exact argument. *United States v. Watts*, 553 F.3d 603 (8th Cir. 2009). In *Watts*, the defendant "challenge[d] the [statutory] mandatory minimum as unconstitutional, alleging that the 100 to 1 crack to cocaine ratio used to set the mandatory minimum is irrational, and disproportionately affects African-Americans." *Id*. at 604. Specifically, the defendant argued that "the statutory minimum sentence may be dispensed with when an equal protection infringement would otherwise result." *Id*. In rejecting the defendant's argument, we explained:

> This court, however, found no such equal protection violation in *United States v. Clary*, 34 F.3d 709 (8th Cir.1994). The defendant in *Clary* alleged the mandatory minimum sentence found in § 841(b)(1) violated his equal protection rights. *Id*. at 710. The district court agreed, but this

-20-

court reversed. *Id*. Relying on extensive Eighth Circuit precedent, we noted "that Congress clearly had rational motives for creating the distinction between crack and powder cocaine." *Id*. at 712. Further, the Equal Protection Clause was not violated because there was no evidence of a racially discriminatory motive—even after noting the percentage of African Americans sentenced under the mandatory minimum. *Id*.; *see also United States v. Mendoza*, 876 F.2d 639, 641 (8th Cir.1989) (finding § 841(b)(1)'s mandatory minimum does not violate due process, or equal protection rights, or constitute cruel and unusual punishment).

The only difference between those cases rejecting [the defendant]'s argument and the facts here are a change in the powder-to-base ratio in the Guidelines and the introduction of bills in Congress to change or eliminate the ratio, as codified in § 841. Neither of these facts, however, warrant a different conclusion. The Supreme Court in *Kimbrough* held a different powder-to-base ratio in the Guidelines and § 841(b)(1) was permissible, and that district court's remain bound by the mandatory minimum sentences. *Kimbrough* [*v. United States*], 128 S. Ct. [558,] 571, 573 [(2007)]. The Court also acknowledged that even the Sentencing Commission in addressing problems generated by the powder-to-base ratio, stated that "any comprehensive solution requires appropriate legislative action by Congress." *Id*. at 569 (emphasis added) (quotation omitted). Finally, while there is proposed legislation in Congress that may remedy the problems in question, these actions remain mere proposals, and it is not the province of this court to anticipate and implement what may or may not occur in Congress.

It may be true, as [the defendant] suggests, that the 100:1 powder-to-base ratio in the context of mandatory minimum sentences has brought "irrationality and possibly harmful mischief into the criminal justice system." *United States v. Smith*, 359 F. Supp. 2d 771, 780 (E.D. Wis.2005). Nevertheless, the *Smith* case, which [the defendant] cites for a discussion on the Sentencing Commission report recommending a change in the 100:1 ratio and to illustrate the ratio's disparate impact, acknowledges that "[o]nly Congress can correct the statutory problem." *Id*. at 781. The powder-to-base ratio undoubtedly affects tens of thousands of people—in 2007 alone, 9,430 people were sentenced to a

statutory minimum sentence for cocaine charges. U.S. Sentencing Comm'n, 2007 Sourcebook of Federal Sentencing Statistics tbl.43 (2007), available at http:// www. ussc. gov/ ANNRPT/ 2007/ table 43. pdf. As frustrating as it may be for [the defendant] to sit in prison and wait for Congress to possibly remedy a sentencing requirement, there is currently no other option.

*Id.* at 604–05; *see also United States v. Alexander*, 301 Fed. Appx. 580 (8th Cir. 2008) (unpublished per curiam) ("[T]he mandatory minimum sentence under section 841(b)(1)(A) is constitutional.").

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____