**UNITED STATES of America,**
Plaintiff,

v.

**Marc Robert ENGELMANN,**
Defendant.

No. 3:11–cr–00047–JEG–TJS.

United States District Court,
S.D. Iowa,
Davenport Division.

March 6, 2013.

John D. Keller, United States Attorney's Office, Davenport, IA, Maureen McGuire, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

Steven P. DeVolder, DeVolder Law Firm, Norwalk, IA, for Defendant.

### ORDER

JAMES E. GRITZNER, Chief Judge.

This matter is now before the Court following remand for further consideration of the Motion for New Trial filed by Defendant Marc Robert Engelmann on the limited issue of the alleged violation of the Court's Sequestration Order. On Novem-

ber 7, 2011, 827 F.Supp.2d 985 (S.D.Iowa. 2011), this Court entered an Order denying the Defendant's Motion for New Trial, ECF No. 57. On December 19, 2012, the United States Court of Appeals for the Eighth Circuit vacated that Order solely on the alleged sequestration violation and remanded for an evidentiary hearing on that issue, the making of supplemental findings of fact, and reconsideration of the Motion for New Trial in light of the evidence obtained at the hearing on the limited issue. *United States v. Engelmann,* 701 F.3d 874, 875, 879 (8th Cir.2012).

The matter came on for evidentiary hearing on February 15, 2013. The Government was represented by Assistant U.S. Attorney (AUSA) John D. Keller, and the Defendant was represented by attorney Steven P. DeVolder.

### *Supplemental Findings of Fact*

Trial commenced in this matter on Monday, September 6, 2011, with making a record prior to jury selection. Pursuant to routine procedure set forth in Federal Rule of Evidence 615, the Court asked the parties if witnesses needed to be sequestered. Only the Government responded in the affirmative, but a request from one party would control under the Rule, and a defense request was thus unnecessary. A Sequestration Order was thus entered on the record simply excluding witnesses from the courtroom during other testimony, with no additional detail. The Court advised it must necessarily rely upon the parties to enforce the Sequestration Order, as the Court would not necessarily recognize the intended witnesses. The Sequestration Order did not apply to the case agent, Special Agent Jeffrey Huber of the Federal Bureau of Investigation (SA Huber). Fed.R.Evid. 615(b).[1]

Because the alleged violation of the Sequestration Order involves a rebuttal wit-

1. *See infra* pp. 9–10.

ness, some discussion of the prior evidence is necessary. On Thursday, September 8, 2011, the Government presented its final witness in its case in chief, SA Jeffrey Huber, who testified regarding interviews with the Defendant. Also present for the interviews was Special Agent James McMillan (SA McMillan). SA Huber was the primary interrogator and SA McMillan the primary note-taker. Both agents compared notes later for the preparation of a detailed outline, which, in turn, became the narrative of the interview contained in what is known as FBI Form FD–302 prepared a few days later.

In the two interviews with the Defendant, the agents covered the nature of the transactions and the possibility of any documentation related to surrounding issues. Pivotal to the issues now before the Court, SA Huber testified Defendant told his client, James Laures (Laures), that the transactions were illegal. He reported Defendant said if he tells the client it is illegal, then whatever the client does in the parking lot after closing, Defendant could not control. Huber testified Defendant knew the lenders did not know the nature of the underlying transaction, and that Excel Title personnel had informed Defendant the lenders were unaware. According to SA Huber, Defendant expressed the view that he notified the other parties to the transactions, had no duty to the lenders, and did what his client desired. SA Huber testified that when he and SA McMillan returned for a second interview session, Defendant stated the bank was the ultimate victim because the transaction was not as indicated, that the HUD–1 Settlement Statement form did need to be accurate, and that he repeatedly told Laures it was illegal.

On cross-examination of SA Huber, defense counsel offered to utilize the FD–302 narrative as a recollection refresher, illustrating that defense counsel had the document in his possession. No reference was made to any inconsistency between the testimony and the contents of the FD–302.

Defendant testified in his own defense. He offered that he had told Laures to make sure the paperwork got to the lender. Defendant asserted he had no knowledge of the identity of the lender and had no reason to contact the mortgage lender. In his direct testimony, Defendant did not directly address the statements attributed by SA Huber.

On cross-examination of Defendant by the Government, Defendant denied telling SA Huber that he knew the transactions were illegal or that he told his client not to go through with them. Defendant denied telling SA Huber that the lenders did not know about kickbacks, or that the banks would not do the transactions in the manner they were formed. He denied saying Excel Title ever advised the lenders were unaware, or that the deals were not compliant with the HUD form. Essentially, Defendant asserted he was simply responding to SA Huber's suggestion that the lenders were unaware and said if that were true they would be victims.

Following Defendant's testimony, the Court stood in regular afternoon recess from 3:04 p.m. to 3:21 p.m. Although there is some confusion in the testimony, apparently events during that break became the focus of the argument that the Sequestration Order had been violated and therefore the subject of the evidentiary hearing on remand.

During the recess, Jay Sommers (Sommers), who at the time of trial was an assistant prosecutor in Scott County, Iowa,[2] was present to testify as a character

---

**2.** Sommers later became a tenant in the Defendant's office building as a private practicing lawyer and later took over the Defendant's law practice.

witness for the Defendant and had been waiting in the lobby area prior to his appearance in the trial. He recalled standing in the lobby area within five feet of his father-in-law, Richard McNamara (McNamara), and his wife, Kathryn Sommers (Ms. Sommers), when his wife called his attention to two people in suits talking approximately twenty-five to thirty feet away and asked if they could do that. Sommers later learned that the two men were SA Huber and SA McMillan. Sommers observed the two men having a discussion in close proximity, with SA Huber in possession of and referring to a spiral notebook. Sommers could hear no actual words, indeed he could not even hear their voices. It was his impression that the conversation was revolving around the contents of the notebook. He observed this for about thirty seconds to one minute.

Ms. Sommers, a realtor and McNamara's daughter, had attended much of the trial in support of the Defendant. Although she thought the conversation she observed was the first day of the trial, Ms. Sommers recalled standing with her father and her husband when her father drew her attention to three men talking. She said the group included the lead prosecutor, SA Huber, and SA McMillan. She was unable to hear their conversation, but it was her impression they were engaged in a discussion. She recalled SA Huber had a notepad, and he was pointing to the notepad during what she believed to be a serious conversation that lasted a few minutes.

McNamara, a self-employed contractor, had known the Defendant for many years, had used the Defendant two hundred to three hundred times on legal business, and attended every day of the trial in support of the Defendant.[3] When the Court took the afternoon recess on Friday, September 9, McNamara had taken the elevator to the second floor and was returning down the staircase when he heard an unidentified person say, "we had Engelmann at his office."[4] McNamara continued on to a location near the entrance to the courtroom and then looked back to see three men talking, SA Huber, SA McMillan, and someone he still does not recognize. He pointed this out to his daughter, Ms. Sommers. McNamara recalled the men were having what he described as a serious conversation, though he could not hear anything that was said. He noted SA Huber had a spiral notebook that was open, and that the conversation was from four to six minutes long.

McNamara was also present for the final arguments of counsel, during which the relative testimony of the Defendant and the agents was referenced. However, McNamara did not advise anyone of his

---

3. McNamara's personal interest in the case was illustrated in various ways in addition to his voluntary act of eventually contacting the Court. His substantial connections to the Defendant were not disclosed when the chambers staff person asked about his connection to the Defendant. AUSA Donald Allegro recalled that during the trial McNamara seemingly tried to overhear the prosecution team discussions. SA Huber recalled McNamara making a thumbs-down negative gesture toward SA Huber as they were leaving the courthouse after SA Huber's testimony. McNamara never reported any problem to the prosecution or the defense or the Court until well after the trial. McNamara refused to be interviewed by the FBI. However, he took it upon himself to investigate whether the courthouse had video recordings of what occurred in the lobby on September 9, 2011. However, in reviewing the evidence in its totality, the Court need not find McNamara's ultimate testimony significantly impaired by the impeachment.

4. Although the specific language used by the unidentified person was left somewhat in doubt, McNamara clarified that he understood the comment to mean the person thought they had obtained the basis for guilt during the interview at the Defendant's office.

observations until September 14, 2011, when he called the chambers of the undersigned judge. (The contents of the letter the Court sent to counsel regarding McNamara's phone call are already sufficiently demonstrated in the record.) During the post-remand evidentiary hearing on the Motion for New Trial, defense counsel attempted to use the Court's letter as a means of eliciting additional testimony from McNamara, as referenced in the Court's letter, that he "overheard the three men talking and 'clearly' heard SA Huber inform SA McMillan how he testified regarding the procedure and techniques they used during the Engelmann investigation." Def. Ex. A, at 1. McNamara did not recall actually hearing the substance of the conversation.[5]

SA McMillan authored an email that was sent to AUSA Keller on September 15, 2011, generally describing his involvement with the Engelmann trial. That email provided a basis for the examination of SA McMillan by counsel for the Defendant in the post-remand evidentiary hearing. SA McMillan's hearing testimony, not the email document, is used for these factual findings.

SA McMillan said he was not instructed to avoid the courtroom during the trial, and in fact had entered the courtroom during a portion of the testimony of Robert Herdrich, one of the underlying co-conspirators, and a couple segments of the testimony of Marc Gellerman, an attorney called as an expert witness by the defense. SA McMillan testified he did not understand he would be called as a witness until the afternoon of Friday, September 9. During the trial week, SA McMillan had casual conversations with SA Huber at the FBI office in Moline, Illinois, about how the trial was going; but SA McMillan denies those discussions ever involved specific testimony of witnesses.

On Friday, September 9, SA McMillan received a phone call from SA Huber at approximately 1:39 p.m., advising that the Defendant had taken the stand to testify. SA McMillan did not then depart the FBI office for the courthouse. At approximately 2:36 p.m., SA McMillan received another call from SA Huber requesting that SA McMillan come to the courthouse. He arrived at approximately 2:50 p.m., shortly before the afternoon recess. Upon arriving at the courthouse, SA McMillan again entered the courtroom while Defendant was on the witness stand. After one minute or less, when SA Huber saw SA McMillan was present, SA Huber advised SA McMillan to immediately leave the courtroom because he may be called as a rebuttal witness.

During the afternoon recess, SA McMillan met with prosecutors AUSA Keller and AUSA Donald Allegro, SA Huber, prosecution expert James Larson, and a paralegal from the prosecutors' office. SA McMillan was then advised that he would be called as a rebuttal witness. SA

---

5. As the Court warned counsel at the hearing, the Court does not consider the contents of the Court's letter, Def. Ex. A, as competent evidence of any conversation that was actually over heard. The letter to counsel was drafted after an unexpected telephone conversation initiated by McNamara to a member of the chambers staff, which was then relayed to the judge. While an effort was made to convey to counsel the general nature of the contact, the letter was not intended to, and does not, constitute sufficient evidence of the truth of the contained statement. The Court's letter was faxed to counsel on the same day McNamara called chambers, but no effort was made by counsel for Defendant to timely obtain a sworn statement or deposition from McNamara. The absence of a more appropriate record continues to undermine the significance of McNamara's contact with the Court. Further, the testimony of Sommers and Ms. Sommers was that they were standing near McNamara and that they could not hear the content of the conversations.

McMillan recalled that SA Huber told him Defendant had denied making certain statements, which he understood to be statements Defendant had made during the interview with the agents. SA McMillan recalled SA Huber's description was very brief and did not involve the substance of the Defendant's testimony, only that the Defendant was denying having made some statements. SA McMillan said he was going to testify to what he observed during the interview and what was memorialized during or after the interview. SA McMillan recalled his discussions during the recess were with AUSA Allegro and were in the nature of witness preparation regarding the subject matter to be covered when he took the stand. SA McMillan denied SA Huber was a part of that discussion, though nearby, and denies SA Huber showed him any notes from the trial.

Trial counsel for the Defendant, attorney David Treimer, testified that he knew and would have recognized SA McMillan but that he did not notice him in the courtroom during the trial. Treimer confirmed he had been in possession of the FD–302 and that the two agents testified consistently with the contents of that investigative report. Treimer had made no effort to cross-examine either agent with inconsistencies between their FD–302 and their trial testimony.

The Government called SA Huber, who denied any effort to coach SA McMillan regarding his testimony and indicated there was never a need to reach some concurrence since they were proceeding consistently with the FD–302. He denied going over any trial notes with SA McMillan or reporting the substance of trial testimony to him. While standing in the group with the prosecutors during the afternoon recess, SA Huber said AUSA Allegro did a witness prep with SA McMillan but that SA Huber did not contribute reference to prior testimony. SA Huber offered that he may have said something indicating the Defendant had "lied" or testified falsely; but he denied offering any specific testimony in that regard. SA Huber did recall having a notebook, but not a spiral notebook—rather, a leather-bound note tablet—which he said would not have contained notes of testimony.

AUSA Allegro testified he decided to call SA McMillan as a rebuttal witness after hearing the Defendant's testimony. During the Friday afternoon recess, AUSA Allegro said he met with SA McMillan for witness preparation and named the areas he would be covering. AUSA Allegro testified he did not ask SA McMillan questions because AUSA Allegro already knew what was in the FBI FD–302 report. AUSA Allegro denied SA Huber provided information about his prior testimony, though SA Huber was nearby in the group. Also, AUSA Allegro denied that he provided any information regarding prior witness testimony.

As the trial transcript reflects, following the Friday afternoon recess, the Government presented its rebuttal evidence. SA Huber was recalled and described the process by which the two agents conducted the interrogation and took notes, then combined their information into a detailed outline, and then prepared the FD–302 interview report, and that this was all done in connection with the interview of the Defendant. SA Huber testified the FD–302 was provided to the defense in discovery. Then SA Huber again testified that the Defendant told Laures the transaction was illegal, and he had told Laures as much before each transaction. SA Huber repeated that Defendant stated the bank is the ultimate victim in the case because the transaction was not accurately reflected on the HUD–1 Settlement Statement. Finally, SA Huber repeated that Defendant said

the banker would not have allowed the kickback, but that the lender did not know.

Lastly, the Government called SA McMillan for very brief testimony. He testified he was the primary note-taker at the interview and that they proceeded to prepare the FD–302. SA McMillan then recalled that Defendant told Laures the transactions were illegal, that the transactions should be accurately reflected on the HUD–1 Settlement Statement, and that Laures should not be manipulating numbers on the HUD–1. SA McMillan testified Defendant said the bank was ultimately the victim, that Defendant repeatedly said the lender did not know about the transaction, and repeated that Excel Title told Defendant the lender did not know. With that, the Government rested.[6]

### *Applicable Law and Discussion*

 "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R. Crim.P. 33(a). "A district court may grant a new trial under Rule 33 only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." *United States v. McClellon,* 578 F.3d 846, 857 (8th Cir.2009) (internal quotation marks and citation omitted). "When faced with a motion for new trial, . . . a district court is permitted to weigh the evidence and judge witness credibility for itself in determining if there may have been a miscarriage of justice such that a new trial is required." *United States v. Samuels,* 543 F.3d 1013, 1019 (8th Cir.2008) (internal quotation marks and citation omitted). Although the Court has broad discretion in deciding a motion for new trial, it "must

exercise the Rule 33 authority sparingly and with caution." *McClellon,* 578 F.3d at 857 (internal quotation marks and citation omitted).

The narrow issue now before the Court is whether there was a violation of the Court's witness Sequestration Order and, if so, whether there was any prejudice to the Defendant sufficient to demonstrate "a miscarriage of justice may have occurred." *Id.* Given the generic nature of the Sequestration Order herein, it gains definition from Federal Rule of Evidence 615, which provides as follows:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own motion. But this rule does not authorize excluding: (a) a party who is a natural person; (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney; (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or (d) a person authorized by statute to be present.

There is no dispute SA Huber, as an investigative case agent for the Government, falls within the second exception; thus, his presence in the courtroom was proper. *See Engelmann,* 701 F.3d at 877 (citing *United States v. Sykes,* 977 F.2d 1242, 1245 (8th Cir.1992) (citing Rule 615 judiciary committee's notes)).

 SA McMillan was not a designated case agent and therefore was covered by the Sequestration Order. The Sequestration Order excluded witnesses from the

---

**6.** As noted by the Court of Appeals, *Engelmann,* 701 F.3d at 875–76, AUSA Keller strongly utilized the testimony of the agents regarding the Defendant's statements in final argument. His argument commenced with, "Ladies and gentlemen of the jury, he con-

fessed." Tr. 778. Because the Court ultimately finds no prejudicial violation of the Sequestration Order, the Court does not discuss the additional details of the argument, but those details are readily available in the record.

courtroom; it did not prohibit the attorneys or SA Huber from meeting with witnesses during the trial. *Id., see United States v. Calderin–Rodriguez,* 244 F.3d 977, 984 (8th Cir.2001) (noting that Rule 615 "does not by its terms forbid an attorney from conferring with witnesses during trial"); *United States v. Kindle,* 925 F.2d 272, 276 (8th Cir.1991) ("The record does not indicate that the trial court's sequestration order prohibited agent-witness contact and such order need not do so to meet the requirements of Rule 615."). If a violation of a sequestration order is established, a defendant must still demonstrate prejudice. *See Engelmann,* 701 F.3d at 878; *United States v. Collins,* 340 F.3d 672, 681 (8th Cir.2003) ("[A]lthough the officer's presence violated the sequestration order, no prejudice occurred.... As such, the district court did not err in denying [the defendant's] mistrial or new trial motions."); *Kindle,* 925 F.2d at 276 ("We cannot conclude from the record before us that appellant suffered any prejudice from the witness contacts...."). Mindful of this legal structure, the Court evaluates the record evidence.

█ As an initial matter, the Court must find SA McMillan was a witness for purposes of the Court's Sequestration Order and Rule 615. He was one of two agents who interviewed the Defendant during which, as the Government alleged, essential confessions occurred. He was one of the authors, if not the primary author, of the FD–302, which clearly provided the basis for the trial testimony of the agents. Given the defense that the Defendant was solely acting as an attorney performing functions required by his client, and the absence of any substantial negative collateral issues should the De-

fendant testify, it would appear highly likely the Defendant would take the stand and would disagree with the characterization given his interview by SA Huber in the Government case in chief. Therefore, in the absence of any attempt to obtain relief from the Sequestration Order for SA McMillan,[7] the Court must conclude he was covered by the Order.

█ As the Court had noted for counsel at the time the Sequestration Order was entered, the Court did not have the ability to recognize SA McMillan, and thus learned only during the evidentiary hearing on the current motion that SA McMillan had been in the courtroom during portions of the testimony of Herdrich, Gellerman, and, briefly, the Defendant. His presence in the courtroom during that testimony violated the Sequestration Order. However, the Court finds no prejudice resulting from that violation.

The testimony offered in rebuttal by SA McMillan was narrow and specific. His testimony bore no direct relationship to that of Herdrich or Gellerman. While the Court cannot determine the precise testimony being offered by the Defendant during the minute or less that SA McMillan was in the courtroom, nothing in this record suggests it was in any way pivotal to the later testimony by SA McMillan. Further, the testimony eventually offered by SA McMillan was confined to the memorialized record of the interview with the Defendant. Accordingly, the Court finds no prejudice resulted from the presence of SA McMillan in the courtroom during the testimony.

█ At the point of the afternoon recess on September 9, 2011, SA McMillan had

---

7. The Court must note that once it was determined that SA McMillan was needed as a rebuttal witness, and that he had been present in the courtroom in apparent violation of the Sequestration Order, the situation could have been presented to the Court for the making of any record and resolution at that time.

arrived at the courthouse and did meet with the prosecutors and SA Huber, among other possible persons. This meeting was taking place in the lobby of the courthouse, not a private room, and was observed by witnesses McNamara and Mr. and Ms. Sommers. Other than the statement characterized as "we had Engelmann at his office" by some unidentified person, overheard by McNamara, no one outside of the conversation heard what was said. The Court can find no particular significance that SA Huber may have had a notebook in his hand, or that the conversation appeared from a distance to be serious, without further indication of what was discussed. The parties to the conversation have denied the conversation involved any disclosure of specific testimony by any witness; they have described the conversation as witness preparation by prosecutor Allegro covering the areas that would be addressed in SA McMillan's rebuttal testimony.

The nearest evidence to the substance of any conversation is SA McMillan's characterization that SA Huber told him the Defendant had denied making "certain statements" during their joint interview. SA McMillan denied that any specific statements were referenced as did SA Huber. Further, SA Huber said he may have offered a comment that the Defendant "lied," or something similarly generic. No other actual witness to the substance of this conversation could provide anything more specific.

As indicated, SA McMillan's testimony was very narrow, reciting statements he believes to have been made in the interview with the Defendant. Clearly that was the entire point of offering his testimony in rebuttal—to report his knowledge and understanding of the information from that interview. There is no dispute his testimony was consistent with the contents of the FD–302 investigation report.

Therefore, no preparation beyond reviewing that report would have been necessary.

On this record, the Court cannot find any prejudice to Defendant that requires a new trial. More fundamentally, absent speculation and argument by interested parties, the only reasonable construction of the events during the afternoon recess on that Friday is a meeting of the prosecutors and their trial team with an upcoming rebuttal witness in which the prosecutor advised that witness of the areas that would be covered. This does not violate the Sequestration Order.

### Second Motion for Release Pending Appeal

Upon the order of remand from the Court of Appeals, the Defendant again sought release pending the consideration of the matter on remand as well as the continuing appeal. Pursuant to the provisions of 18 U.S.C. § 3143(b)(1)(A, B), the Defendant must be detained unless it can be demonstrated

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person of the community . . . and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i) reversal,

(ii) an order for a new trial . . .

There is no question the Defendant is not likely to flee nor pose a danger. Nor does the Court regard the appeal as a delaying tactic. The issue has always been whether the appeal raises a "substantial question." It was on that basis that the Court denied the Defendant's initial motion for release. ECF No. 94. Because resolution of that question necessarily required the Court to proceed with the evidentiary hearing on remand, the Court deferred the matter until this time. ECF No. 143.

Essentially, the Defendant must demonstrate the matter on appeal is a close question that could go either way. *United States v. Powell* 761 F.2d 1227, 1233–34 (8th Cir.1985) (en banc). Then, the Defendant must demonstrate that should he prevail on the issue, "it is more probable than not that reversal or a new trial will occur. . . ." *Id.* at 1234.

The Court is compelled to find the record created on remand demonstrates neither prejudice that impaired the fundamental fairness of the proceeding nor, with regard to the Friday afternoon recess meeting, any violation of the Sequestration Order. Therefore, the Court cannot find this is a close question.

### CONCLUSION

Based on the foregoing, the Court finds the Motion for New Trial (ECF No. 53) on the specific issue of a violation of the Sequestration Order, pursuant to remand, must be **denied.** Defendant's Second Motion for Release Pending Appeal (ECF No. 138) must be **denied.**

**IT IS SO ORDERED.**