IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1635-10






THE STATE OF TEXAS





v.



ROY ANDREW WEAVER, Appellee





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE NINTH COURT OF APPEALS


POLK COUNTY





 Cochran, J., delivered the opinion of the Court in which Meyers, Price,
Womack, Johnson and Alcala, JJ., joined. Keller, P.J., filed a dissenting
opinion in which Keasler and Hervey, JJ., joined. Keasler, J., filed a dissenting
opinion in which Keller, P.J., and Hervey, J., joined.


O P I N I O N 



 Four police officers came to Mr. Weaver's welding shop looking for a person wanted
in another county. Mr. Weaver gave the officers consent to search for that person. The
officers, over Mr. Weaver's objection, ended up searching a van on his property and finding
drugs in it. The trial judge granted Mr. Weaver's motion to suppress because he found that
the search of the van exceeded the scope of Mr. Weaver's consent. The court of appeals,
over a dissent, affirmed. We granted review in light of the justices' disagreement. Because
we agree that the resolution of this case turns on the scope of Mr. Weaver's consent, we
affirm the judgment of the trial court and that of the court of appeals.

I.

 Roy Andrew Weaver owned a welding shop in Polk County. (1) There was a front office
and a workshop in the rear. At the back on one side of the workshop was an open bay door
with a van backed into it. Also parked in the back yard were several "broken down"
vehicles, a boat, and "some other items." One day, while the shop was open, four Polk
County narcotics officers came looking for Jerry Barksdale ("Bear"), who worked or "hung
out" at the shop. Bear was wanted in another county for organized crime. When the officers
arrived, they saw Bear's car parked out in front of the shop. The officers asked Mr. Weaver
if they "could look around for the guy," and he gave them "consent to look for him." 

 The officers looked around for about ten minutes, but Bear was not at the shop nor 
inside the van that was backed up in the workshop bay door. Nonetheless, because the
narcotics officers had received information "that there was also methamphetamine being used
and distributed from the business," they lingered in the shop.

 Sergeant Smith "just began talking to Mr. Weaver. We were standing just inside the
shop. I asked him if he had any illegal guns, knives, narcotics, anything like that. He
advised no. He-well, he did tell me he had some guns inside the office." Mr. Weaver
showed Sgt. Smith the licensed guns in his office. After they came out of the office, Sgt.
Smith then asked "who the van belonged to." Mr. Weaver said that it was his dad's van but
that he drove it. When Sgt. Smith asked if he could search the van, Mr. Weaver refused
consent.

 As soon as Mr. Weaver refused consent, Sgt. Smith told Lieutenant Lowrie to retrieve
his drug-dog from the patrol car and run the dog around the van parked in the bay door of the
workshop. The dog showed "odor response" to the passenger door. The van was searched,
and a tin box that contained glass pipes and some methamphetamine was found on the
floorboard between the door and the passenger's seat. Mr. Weaver was arrested and charged
with possession of methamphetamine. He filed a motion to suppress which the trial judge,
after hearing testimony from Sgt. Smith and Lt. Lowrie, granted. The judge entered findings
of fact, including the following:

 3. The defendant gave the officers permission to search his shop for
Barksdale. . . .


 4. A van was located beside the defendant's shop on property owned by
the defendant. Officers looked through the van windows and did not
see Barksdale or any contraband.

 . . .


 6. The officers asked the defendant for permission to search the van. The
defendant refused permission and the officers used a drug canine to
walk outside of the van.


Based upon his factual findings, the trial judge concluded, 


 The officers exceeded the scope of their search after they did not find
Barksdale and they did not have enough cause to conduct the canine search on
the van which they did not see being operated.


 The State appealed, arguing that the officers and Mr. Weaver had a consensual
interaction that never became a detention until the canine alert provided probable cause to
arrest Mr. Weaver. Mr. Weaver responded that the consensual encounter became an
unlawful detention before the dog sniff. The court of appeals affirmed the trial court's ruling
and held, 

 In this case, the evidence shows that when the officers' search for "Bear"
ended, they had not observed anything suspicious. Because the trial judge
could have determined that Weaver's consent to search for "Bear" had ended,
the trial court could reasonably find that the officers, without establishing
probable cause, were not entitled to search for other purposes unrelated to that
of their initial search. Under the facts of this case, we conclude the trial court
did not abuse its discretion in granting Weaver's motion to suppress. The trial
court's ruling is affirmed. (2)

 Justice Gaultney dissented. He framed the issue as "whether the canine sniff of the
exterior of the van while the officers were talking with Weaver was an impermissible
'search' for Fourth Amendment purposes." (3) He concluded, "In this case the officers were
on the business premises legally with the consent of the owner. They had not been asked to
leave. Although the owner refused consent to a search of the van, the canine sniff of the
exterior of the van, made while officers were questioning Weaver, was not a 'search' for
Fourth Amendment purposes." (4)

 The State Prosecuting Attorney (SPA) filed a petition for discretionary review, asking:
"May police conduct a dog sniff of the exterior of an unoccupied vehicle in the parking lot
of a business without the permission of the owner of the business?" We granted review in
light of the justices' disagreement on a material question of law. (5)

II.

A. Standard of Review.

 When reviewing the ruling on a suppression motion, the trial judge's determination
of facts-if supported by the record-is afforded almost total deference. (6) Regardless of
whether the judge granted or denied the motion, appellate courts view the evidence in the
light most favorable to the trial judge's ruling. (7) The prevailing party is afforded the strongest
legitimate view of the evidence and all reasonable inferences that may be drawn from that
evidence. (8) We review a trial court's application of the law of search and seizure to the facts
de novo. (9) "We will sustain the trial judge's ruling if that ruling is 'reasonably supported by
the record and is correct on any theory of law applicable to the case.'" (10)

B. The Scope of Consent Under the Fourth Amendment.

 The Fourth Amendment protects individuals against unreasonable searches and
seizures. (11) Reasonableness is the touchstone of the Fourth Amendment. (12) And, "except in
certain carefully defined classes of cases, a search of private property without proper consent 
is 'unreasonable' unless it has been authorized by a valid search warrant." (13) The Supreme
Court has "long approved consensual searches because it is no doubt reasonable for the
police to conduct a search once they have been permitted to do so." (14) Although consent must
be positive, it may be given orally or by action, or it may be shown by circumstantial
evidence. (15) The validity of an alleged consent to search is a question of fact to be determined
from the totality of the circumstances. (16) Under Texas law, the State must prove voluntary
consent by clear and convincing evidence. (17)

 The scope of a search is usually defined by its expressed object. (18) A person is free
to limit the scope of the consent that he gives. (19) If police rely on consent as the basis for a
warrantless search, "they have no more authority than they have apparently been given by the
consent." (20) It is therefore "important to take account of any express or implied limitations or
qualifications attending that consent which establish the permissible scope of the search in
terms of such matters as time, duration, area, or intensity." (21) On the other hand, a person's
silence in the face of an officer's further actions may imply consent to that further action. (22) 
The "standard for measuring the scope of a suspect's consent under the Fourth Amendment
is that of 'objective' reasonableness-what would the typical reasonable person have
understood by the exchange between the officer and the suspect?" (23) Therefore, a court
reviewing the totality of the circumstances of a particular police-citizen interaction does so
without regard for the subjective thoughts or intents of either the officer or the citizen. (24) 
Still, in Texas, the "clear and convincing" burden "requires the prosecution to show the
consent given was positive and unequivocal and there must not be duress or coercion, actual
or implied." (25)

C. Business and Commercial Premises are Protected Areas.

 The occupant of a business establishment enjoys the same constitutional right to be
free from unreasonable searches as does the occupant of a private residence. (26) But "business
and commercial premises are not as private as residential premises," and "consequently there
are various police investigative procedures which may be directed at such premises without
the police conduct constituting a Fourth Amendment search." (27) Police, although motivated
by an investigative purpose, are as free as the general public to enter premises "open to the
public," when they are open to the public. (28) Officers are then entitled to note objects in plain
view, (29) or examine merchandise as a customer would. (30) For "actions not to constitute a
Fourth Amendment search, the officer must remain in that portion of the premises which is
open to the public." (31) 

III.

 The SPA asserts that the motion to suppress was granted based on incorrect
conclusions of law rather than any fact-findings that were unfavorable to the State. These
conclusions were incorrect, argues the SPA, because 1) the officers did not need permission
to be in "the parking lot" when they initiated the dog sniff; 2) neither Mr. Weaver nor the
van were seized in order to conduct the dog sniff; 3) the dog sniff was not a search; and 4)
the dog's positive alert justified the search. The Supreme Court has made it clear that a dog
sniff is not a search, (32) and it is generally accepted that a positive alert by a certified drug dog
is usually enough, by itself, to give officers probable cause to search. (33) We agree with the
SPA that neither Mr. Weaver nor the van were seized in order to conduct the dog sniff. 

 But, as discussed below, the SPA assumes a fact that is not in evidence: that the van
was parked in a parking lot "open to the public." (34) Viewing the evidence in the light most
favorable to the trial judge's ruling, this area was not part of the "public" area of his welding
shop. Therefore, the officers needed permission to be where they were when they initiated
the dog sniff, but they did not have it. (35)

A. Affording appellee the "strongest legitimate view of the evidence," the van was not
parked in a parking lot open to the public.

 The SPA's position is apparent in the way it framed the issue for review: "May
police conduct a dog sniff of the exterior of an unoccupied vehicle in the parking lot of a
business without the permission of the owner of the business?" Surely the answer to that
question, on its face, is yes. A public parking lot is public regardless of whether a nearby
business is open or not. 

 In Illinois v. Caballes, (36) the Supreme Court held that the use of a narcotics-detection
dog to sniff around the exterior of a motorist's vehicle during a lawful traffic stop did not
violate the Fourth Amendment because it revealed no information other than the location of
a substance that the individual had no right to possess. (37) In keeping with Justice Ginsburg's
prophecy that Caballes "clears the way for suspicionless, dog-accompanied drug sweeps of
parked cars along sidewalks and in parking lots," (38) it has done just that. Federal and state
courts alike have used Caballes to uphold dog sniffs in the public parking lots of gas stations,
hotels, restaurants, and high schools. (39) But in Caballes, Justice Stevens emphasized that the
police cannot prolong a traffic stop beyond the time reasonably required to accomplish its
purpose simply to give them time to bring in a drug dog. (40) As our courts of appeals have
recognized, officers initiating a dog sniff must have the right to be where they are at the time
they initiate a dog sniff. (41)

 It is the Caballes line of cases that the SPA relies on here. The problem in this case
is that no one, except the prosecutor, characterized the place the van was parked as a
"parking lot." Lt. Lowrie said that the truck was parked in a "sall[y] port."

Q. Where was the van parked?


A. It was the-I guess it would be the north side of the building back up to the big sall[y]
port (42) on the building.


Q. Is it, like, a parking lot or a parking area?


A. It's a big, bay door. I guess you would say it's kind of like a loading/unloading for
the business area.

 The State argued to the trial court that "The vehicle . . . was located on a parking lot
that was in-in a business that was open for public use or open to the public. So the fact that
the officers decided to run the canine, even though maybe they didn't see or smell something,
they didn't have to have any type of reasonable suspicion to do that." The SPA argues
similarly: "While on the premises of a business open to the public, police are permitted to
conduct a dog sniff of vehicles parked in the parking area. . . . The unoccupied van was
parked in the parking lot[.]" (43) 

 But the trial court did not find that the van was parked in a public parking lot. Rather,
it found the van "was located beside the defendant's shop on property owned by the
defendant." The prevailing party is afforded the strongest legitimate view of the evidence
and all reasonable inferences that may be drawn from that evidence. The facts here support
the trial court's implicit finding that the van was not parked on any part of the business
premises open to the public or in a public "parking lot." (44) From the evidence in this record,
the trial judge could have found otherwise, but he did not do so. We are obliged to give
almost total deference to his implied factual findings. (45) Therefore, unless the officers had
Mr. Weaver's consent to be standing beside the van at the loading dock, they were no longer
entitled to be in the non-public portion of the welding workshop at the time they conducted
the dog sniff. (46)

B. Affording Mr. Weaver the "strongest legitimate view of the evidence," the officers
did not have continued consent to be on the premises at the time they ran the dog
sniff.

 The SPA asserts that the officers-who had lawfully entered the premises- were "under
no obligation to leave unless asked" and that there "was no evidence or fact finding that the
officers were ever asked to stop their investigation or leave the premises." (47) But the relevant
question here is as follows: What would the typical reasonable person have understood by
the exchange between the officers and Mr. Weaver? (48) Mr. Weaver gave oral consent to
search his welding shop for "Bear," voluntarily showed the officers his registered guns, (49) and
then unequivocally refused to consent to a search of the van backed up in the loading dock
of his shop. 

 We recently addressed the scope of a consent to search under the Fourth Amendment
in Valtierra v. State. (50) There, the trial court and the court of appeals agreed that Heriberto
Valtierra consented to have police officers enter his apartment to talk to Erica, a 13-year-old
runaway. The question before us was whether Heriberto's consent extended to the officer's
act of walking down the open hallway to knock on the bathroom door where Erica was said
to be taking a shower. We held that it was objectively reasonable for the officer to conclude
that Heriberto's general consent to come inside the apartment to talk to Erica included
consent to walk down the open hallway to knock on the bathroom door. (51) Thus, the officer
was lawfully present in the hallway when he observed, through an open bedroom door, two
men making furtive gestures and throwing items under the bed. (52) 

 This case is like Valtierra in that the officers here obtained oral consent to enter the
premises to look for a specific individual. This case is also unlike Valtierra, because here
the officers had finished looking for the specific individual and had achieved the ostensible
purpose of their entry. And here, unlike in Valtierra, Mr. Weaver unequivocally said "No,"
to a further search of his van.

 The legal question is, what would "the typical reasonable person have understood by
the exchange between the officer and the suspect?" We think that it was objectively
unreasonable for the officers to conclude that Mr. Weaver's act of objecting to the van search
indicated, by clear and convincing evidence, his consent for the officers to remain standing
beside his van while one officer went back out to the patrol car and retrieved a drug dog to
run around his van. (53) A typical reasonable person would have understood-from Mr.
Weaver's refusal of consent to search the van-that he had had enough. It would be
unreasonable for that typical person, having heard an unequivocal "No," to think that he had
"positive and unequivocal" consent, not only to remain standing beside the van on the non-public premises, but also to retrieve yet another unwelcome intruder. There is certainly no
indication in the record that Mr. Weaver consented for the officers to bring the drug dog from
the patrol car to the van parked at his loading dock. From these facts, the trial judge could
have concluded that the consent to search for "Bear" was lawful at its inception, but that it
had been completed. The officers had completed their stated mission. Thus, when Mr.
Weaver unequivocally said "No" to any further search of his van, the officers violated the
Fourth Amendment by remaining on his private business premises and bringing in a drug dog
without legal authorization. Therefore, the trial judge could have justifiably concluded that
the "nonconsensual" use of the drug dog and the subsequent discovery of contraband were
the product of an unconstitutional search on private premises. 

 The record, viewed in the light most favorable to the trial judge's ruling, supports an
implicit fact finding that the van was parked in a protected, non-public area of the business
premises rather than in a parking lot open to the public. And the record also supports the trial
judge's legal conclusion that the officers had worn out their welcome and lingered beyond
the scope of Mr. Weaver's consent before the initiation of the dog sniff. We recognize that
this case is a close call-but it is in the "close call" cases that the need for giving discretion
to the trial judge and deferring to his factual findings is greatest, especially when the State
must prove positive consent by clear and convincing evidence. We therefore affirm the court
of appeals's judgment that upheld the trial judge's ruling.


Delivered: September 28, 2011

Publish
1. The shop is located at 203 Gray Drive in Livingston.
2. State v. Weaver, 2010 Tex. App. LEXIS 7425, *9 (Tex. App.--Beaumont Sept. 8, 2010)
(not designated for publication)
3. Id. at *10-11 (Gaultney, J., dissenting).
4. Id. at *11-12 (citing City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000); Illinois v.
Caballes, 543 U.S. 405, 410 (2005); United States v. Place, 462 U.S. 696, 707 (1983)).
5. Tex. R. App. P. 66.3(e).
6. State v. Woodard, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011) (citing Guzman v.
State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).
7. Id. (citing State v. Garcia-Cantu, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008);
Gutierrez v. State, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007)).
8. Id. (citing Garcia-Cantu, 253 S.W.3d at 241).
9. Valtierra v. State, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); Wiede v. State, 214
S.W.3d 17, 25 (Tex. Crim. App. 2007).
10. Valtierra, 310 S.W.3d at 447-48 (quoting State v. Dixon, 206 S.W.3d 587, 590 (Tex.
Crim. App. 2006)).
11. U.S. Const. amend. IV. 
12. Florida v. Jimeno, 500 U.S. 248, 250 (1991).
13. Camara v. Municipal Court, 387 U.S. 523, 528-29 (1967). 
14. Jimeno, 500 U.S. at 250-51.
15. Valtierra, 310 S.W.3d at 448; Johnson v. State, 226 S.W.3d 439, 446 n.27 (Tex. Crim.
App. 2007); Gallups v. State, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004).
16. Valtierra, 310 S.W.3d at 448; Ohio v. Robinette, 519 U.S. 33, 39-40 (1996); Gallups,
151 S.W.3d at 200-01; Guevara v. State, 97 S.W.3d 579, 582 (Tex. Crim. App. 2003).
17. Valtierra, 310 S.W.3d at 448; Reasor v. State, 12 S.W.3d 813, 817 (Tex. Crim. App.
2000); Meeks v. State, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985).
18. Jimeno, 500 U.S. at 251.
19. Id. at 252 ("A suspect may of course delimit as he chooses the scope of the search to
which he consents.").
20. 4 Wayne R. LaFave, Search and Seizure § 8.1© at 19 (4th ed. 2004).
21. Id. 
22. Valtierra, 310 S.W.3d at 449. Accord United States v. Starr, 533 F.3d 985, 996 (8th
Cir. 2008) ("Starr was present during the officers' full search of his home, but remained silent
and made no attempt to impede their efforts or to express his concern that they were exceeding
the scope of his consent. Given these facts, we conclude that a reasonable person would have
believed that the officers had authority to conduct a full search of Starr's home including his
closet and a roll of film; therefore, this warrantless search did not violate the Fourth Amendment
because it was authorized by Starr's consent.").
23. Florida v. Jimeno, 500 U.S. at 251. 
24. Meekins v. State, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011) (citing Maryland v.
Macon, 472 U.S. 463, 470-71 (1985); Scott v. United States, 436 U.S. 128, 136 (1978)).
25. Meeks v. State, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985).
26. See v. Seattle, 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a
residence, has a constitutional right to go about his business free from unreasonable official
entries upon his private commercial property."); Oliver v. United States, 466 U.S. 170, 178 n.8
(1984) ("The Fourth Amendment's protection of offices and commercial buildings, in which
there may be legitimate expectations of privacy, is based upon societal expectations that have
deep roots in the history of the Amendment.").
27. 1 LaFave, supra note 20, § 2.4(b) at 627.
28. Maryland v. Macon, 472 U.S. 463, 470 (1985).
29. United States v. Morton, 17 F.3d 911, 913 (6th Cir. 1994) (discovery and seizure of the
gun did not violate the Fourth Amendment; testimony fairly established that the auto shop was
open to the public for business, so the officers lawfully entered the shop, and, when the defendant
stood up, an officer saw, in plain view, a gun in defendant's back pocket).
30. Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329 (1979) (Fourth Amendment violated
by sweeping search of "adult" bookstore; officers viewed films "without the payment a member
of the public would be required to make," and viewed magazines and books "not . . . as a
customer would ordinarily see them" by removing cellophane wrappers).
31. 1 LaFave, supra note 20 § 2.4(b) at 630. Courts have held that searches of private
offices, airline baggage rooms, employee break rooms, employee locker rooms, private dressing
rooms of entertainers, etc. are not sustainable on the theory of "store premises open to the
public." Id. (collecting cases).
32. Illinois v. Caballes, 543 U.S. 405, 409 (2005) (holding that a canine sniff of an
automobile need not be justified by reasonable articulable suspicion of drug activity); City of
Indianapolis v. Edmond, 531 U.S. 32, 40 (2000) (recognizing that a canine sniff of an automobile
is not a search); United States v. Place, 462 U.S. 696, 706-07 (1983) (holding that a canine sniff
of luggage does not constitute a search). These holdings are based on the legal theory that a
canine sniff by a well-trained narcotics-detection dog is not Fourth Amendment search because it
reveals no information other than the location of a substance that no individual has a legitimate
privacy interest in. They are all premised, however, upon a finding that the officer-and therefore
the dog-have a right to be standing where they are at the time of the canine sniff.
33. United States v. Parada, 577 F.3d 1275, 1282 (10th Cir. 2009). 
34. It has been suggested that this Court should remand this case to the trial judge to enter a
specific finding on a disputed fact that is dispositive to the appeal. See State v. Elias, 339
S.W.3d 667, 676 (Tex. Crim. App. 2011). But here, unlike the situation in Elias, there is no
disputed fact issue. There is no evidence in this record that the van backed into the workshop
bay door was located in a "parking lot" or an area that was open to the general public. The State
argues that the van was located in a public parking lot, but there is no evidence from any witness
in the record that supports that argument. We need not remand this case for the trial judge to
enter a finding on a fact that, based on the record, is not in dispute.
35. Weaver, 2010 Tex. App. LEXIS 7425, at *9 ("Because the trial judge could have
determined that Weaver's consent to search for 'Bear' had ended, the trial court could reasonably
find that the officers, without establishing probable cause, were not entitled to search for other
purposes unrelated to that of their initial search."). 
36. 543 U.S. 405 (2005).
37. Id. at 409.
38. Id. at 422 (Ginsburg, J., dissenting) ("Today's decision . . . clears the way for
suspicionless, dog-accompanied drug sweeps of parked cars along sidewalks and in parking
lots.").
39. United States v. Dyson, 639 F.3d 230-33 (6th Cir. 2011) (dog sniff of an unoccupied,
parked Maxima at gas station "does not in itself require reasonable suspicion"); United States v.
Perez, 440 F.3d 363 (6th Cir. 2006) (dog sniff of unoccupied Tahoe, which sat in the parking lot
of the hotel and was not stopped, detained or moved, was not a search or seizure; no reasonable
suspicion is required when using a drug-sniffing dog); United States v. Engles, 481 F.3d 1243,
1245 (10th Cir. 2007) (dog sniff of the exterior of a vehicle parked in a restaurant parking lot
does not require reasonable suspicion because it is not a Fourth Amendment intrusion); State v.
Hobbs, 933 N.E.2d 1281, 1286-87 (Ind. 2010) (dog sniff of car in Pizza Hut lot, conducted under
circumstances in which Hobbs was not unconstitutionally seized, not Fourth Amendment
violation); Dowty v. State, 210 S.W.3d 850, 854-55 (Ark. 2005) (dog sniff of Grand Am and
Suburban at a Western Sizzlin' parking lot not Fourth Amendment search); Myers v. State, 839
N.E.2d 1154, 1159 (Ind. 2005) (high-school-student defendant's car was subject to the narcotics
dog-sniff test absent reasonable particularized suspicion, as it was parked and unoccupied and the
defendant was in school).
40. Caballes, 543 U.S. 407-08 ("A seizure that is justified solely by the interest in issuing a
warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably
required to complete that mission. In an earlier case involving a dog sniff that occurred during an
unreasonably prolonged traffic stop, the Illinois Supreme Court held that use of the dog and the
subsequent discovery of contraband were the product of an unconstitutional seizure. We may
assume that a similar result would be warranted in this case if the dog sniff had been conducted
while respondent was being unlawfully detained.") (citation omitted).
41. See Branch v. State, 335 S.W.3d 893, 901(Tex. App.--Austin 2011, no pet.) ("Given
the evidence regarding the initial traffic stop and the arrival of the drug-detection dog, all of
which shows that the dog arrived within eight minutes of the traffic stop and before Wingfield
finished conducting normal procedures for a traffic stop, we conclude that the record supports an
implied finding by the trial court that the time it took for the dog to arrive did not prolong the
initial stop beyond the time reasonably required to complete the mission of the stop."); Johnson
v. State, 323 S.W.3d 561, 562-63 (Tex. App.--Eastland 2010, pet. ref'd) (Fourth Amendment
does not requires reasonable suspicion to justify using a drug-detection dog to sniff a vehicle
during a legitimate traffic stop; while one officer was running a check on appellant's driver's
license, another officer had his drug-detection dog conduct an open-air search around the vehicle,
and the dog alerted on the driver's door).
42. Sally port may have been an unfortunate choice of words. It literally means "1. in
fortification, a postern gate, or a passage under ground from the inner to the outer works, to
afford free egress to troops in making a sally, closed by massive gates when not in use. 2. a large
port on each quarter of a fire ship, for the escape of the men into boats when the train is fired;
also, a large port in an ironclad." Webster's New Twentieth Century Dictionary
Unabridged 1599 (2nd ed.1983). What the officer undoubtedly meant to say was that the van
was backed into a loading-dock bay at the rear of the welding workshop.
43. SPA's Brief at 4, 7.
44. The record indicates that the parking lot for the welding shop was at the front of the
shop where "Bear's" car was parked. Furthermore, it is unlikely that Mr. Weaver would be
storing his "broke down" vehicles, boat, and other items in a public parking lot, and Lt. Lowrie
testified that those items were out in "the back" area with the van. It is also unlikely that the
general public would have access to the workshop area and loading dock of a welding shop as
welding operations involve both significant fire hazards and risks due to the use and movement
of heavy equipment. 
45. State v. Woodard, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).
46. Cf. Buchanan v. State, 129 S.W.3d 767, 774 (Tex. App.--Amarillo 2004, pet. ref'd). 
In that case, the trial court denied a motion to suppress, but made no findings. The court of
appeals, viewing the facts in the light most favorable to the prevailing party as it was required to
do, found that appellant had no legitimate expectation of privacy in the dirt driveway entrance to
a business run behind his house:


 The time of day, the presence of no one outside the fence with whom the officers
could speak, the large open gate, the presence of a well-defined dirt driveway
leading through the gate to a building behind the empty house, appellant's
operation (behind the gate) of a business involving vehicles owned by third
parties, the reasonable inference not only that third parties passed through the
gates to obtain appellant's mechanical services but also that they were authorized
to do so during normal business hours, the lack of any evidence illustrating that
only appellant or certain designated individuals could drive their cars through the
gate, the presence of a third party actually working on his vehicle inside the
fenced lot, and the officers confining themselves to the well-defined dirt driveway
are indicia upon which a trial court could reasonably find that appellant had no
legitimate expectation of privacy in the dirt driveway behind the fence and that
which could be perceived from it. Thus, no search occurred when the officers
passed through the gate while utilizing that path and smelled the ether. Nor can
we say that the trial court abused its discretion in refusing to find that the entry
violated appellant's constitutional rights.

Id. at 774. 
47. SPA's Brief at 7.
48. Florida v. Jimeno, 500 U.S. 248, 251(1991).
49. See State v. Bagby, 119 S.W.3d 446, 450 (Tex. App.--Tyler 2003, no pet.) (officer's
entry into appellee's shed was expressly limited in scope by appellee to officer's inspection of the
firearms to determine if they had been recently discharged; continuation of search of shed after
inspection was finished-resulting in discovery of methamphetamine-violated scope of consent ).
50. 310 S.W.3d 442, 451-52 (Tex. Crim. App. 2010).
51. Id.
52. Id.
53. Accord Baldwin v. State, 278 S.W.3d 367, 372 (Tex. Crim. App. 2009) ("Deputy Smith
believed that appellant's answer to a question regarding the location of his identification
constituted permission to retrieve that identification. We find this belief to be objectively
unreasonable. Appellant's response was simply an answer to the officer's question (after being
handcuffed) and not a consent for the officer to search his person.") (emphasis added).